**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DANIEL L. BRUTON,** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL NO. 3:CV-04-0083** |
| | : | |
| **v.** | : | **(Judge Caputo)** |
| | : | |
| **FRANK D. GILLIS, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**MEMORANDUM AND ORDER**

**I.    BACKGROUND**

Daniel L. Bruton, an inmate confined in the State Correctional Institution, Coal Township ("SCI-Coal Township), Pennsylvania, filed the above captioned civil rights action  pursuant to 42 U.S.C. § 1983.  He claims that defendants violated the Eighth Amendment when they failed to provide adequate medical treatment for his back injury, and failed to repair damaged sidewalks, resulting in additional back injuries.  Named as Defendants in the complaint are the following SCI-Coal Township employees: Frank D. Gillis, former Superintendent; Joseph Piazza, Deputy Superintendent for Facilities Management; David Patton, Deputy Superintendent for Centralized Services; Wilma J. Sewell, Corrections Health Care Administrator; Jane Dando, Nurse Supervisor; Mary P. Hensler, Registered Nurse; Christopher T. Yackiel, Registered Nurse, as well as, Sharon Burks, former Chief Grievance Coordinator in the Secretary's Office of Inmate Grievances and Appeals; Jeffrey A. Beard, Secretary of Department of Corrections; Dr. Phillip Breen, Wexford Health Sources; and Brian Davis, Physician's Assistant employed by Wexford Health Sources.

Presently before the court are three separate motions for summary judgment, filed by the named Defendants.  (Docs.  157, 160, 163).  For the reasons that follow, the motions will be granted.

## II.    <u>Standard of Review</u>

Federal Rule of Civil Procedure 56(c) requires the court to render summary judgment " . . . forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c). "[T]his standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  <u>Anderson</u>, 477 U.S. at 248; <u>Gray v. York Newspapers, Inc.</u>, 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  <u>Anderson</u>, 477 U.S. at 257; <u>Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America</u>, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party.  <u>Moore v. Tartler</u>, 986 F.2d 682 (3d Cir. 1993); <u>Clement v. Consolidated Rail Corporation</u>, 963 F.2d 599, 600 (3d Cir.

1992); <u>White v. Westinghouse Electric Company</u>, 862 F.2d 56, 59 (3d Cir. 1988).  In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings.  When the party seeking summary judgment satisfies its burden under Rule 56(c) of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56(e) to go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue.  <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 324 (1986).  The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts."  <u>Matsushita Electric Industrial Co. v. Zenith Radio</u>, 475 U.S. 574, 586 (1986).  When Rule 56(e) shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  <u>Celotex</u>, 477 U.S. at 323.  <u>See</u> <u>Harter v. G.A.F. Corp.</u>, 967 F.2d 846, 851 (3d Cir. 1992).

**III.    Statement of Facts**

From the pleadings, declarations and exhibits submitted therewith, the following facts can be ascertained as undisputed.

On September 12, 2001, Bruton was transferred from SCI-Rockview to SCI-Coal Township.  (Doc. 158, Ex. A, Progress Notes).

In November, 2002, Bruton alleges that he injured his right hip while doing sit-ups. (Doc. 156, second amended complaint at Section IV, ¶ 1).

On December 23, 2002, Bruton reported to Medical Sick Call for the first time relating to his hip injury. (Doc. 158, Ex. A, Progress Notes). Bruton's medical Progress Notes reflect that he stated that he "threw [his] back out" and explained that it had happened "about 3 weeks ago while doing sit-ups." Id. Bruton was examined by Defendant Davis, who noted that Bruton did not appear to be in distress and diagnosed Plaintiff as suffering from "Lumbar strain." Id. Bruton was prescribed a fourteen (14) day course of AF Cream, a topical corticosteroid for relief of inflammation, as well as Robaxin, 750 mg for 7 days, for pain. (Doc. 158, Ex. B, Physician's Orders).

On December 26, 2002, Bruton was seen by Physician's Assistant, Don Miller. (Doc. 158, Ex. A, Progress Notes). He complained of right hip pain and reduced range of motion. Id. The order for Robaxin was discontinued. (Doc. 158, Ex. B, Physician's Orders). Dr. Breen ordered an x-ray of Bruton's right hip, as well as 600 mg. of Motrin, for pain and placed Bruton on a five-day medical lay-in. Id. . (Doc. 158, Ex. B, Physician's Orders).

On December 30, 2002, Bruton's x-ray was performed. (Doc. 158, Ex. C, X-ray report).

On December 31, 2002, Bruton was seen by P.A. Don Miller, complaining again of pain in his right hip. (Doc. 158, Ex. A, Progress Notes). At that time, the X-ray results were pending and Bruton had already been placed on Motrin, for his pain. (Doc. 158, Ex. A, Progress Notes, Ex. B, Physician's Orders).

4

On January 6, 2003, Bruton saw Defendant Davis, again complaining of hip pain. At that time, the X-ray results were still pending, however, Defendant Davis wrote another prescription for Motrin. Id.

On January 14, 2003, Bruton returned to Defendants Davis, complaining of pain shooting down his right leg. At that time, Defendant Davis had the benefit of the x-ray report which revealed the following:

> RT HIP - Unremarkable soft tissues and skeletal structures. No evidence of fracture, dislocation or significant degenerative change.
>
> PELVIS - Radiographs of the pelvis demonstrates the pelvic skeletal structure and hips to be remarkable. No evidence of fracture or bone destruction.
>
> IMPRESSION - Unremarkable pelvis.

(Doc. 158, Ex. C, X-ray Report). Defendant Davis, however, ordered an x-ray of Bruton's lumbosacral spine to determine whether there was disc herniation. (Doc. 158, Ex. A, Progress Notes).

On January 16, 2003, the X-ray of the lumbar spine was performed . (Doc. 158, Ex. D, X-ray Report).

On January 21, 2003, Defendant Davis again saw Bruton. (Doc. 158, Ex. A, Progress Notes). Bruton reported that his back pain remained the same. Id. At this time, Defendant Davis offered Bruton Prednisone, however, Bruton stated that he "want[ed] to wait for x-ray results." Id. Bruton was then prescribed 800 mg of Motrin. (Doc. 158, Ex. B, Physician's Orders).

5

On January 28, 2003, the results of the x-ray were received at the prison.  (Doc. 158, Ex. D, X-ray Report).  They stated the following:

> AP and lateral examination of lumbar spine show no compression fractures. There is narrowing of the disc space seen at L5 as well as sclerotic changes of the adjacent vertebral. The rest of the disc spaces, spinous process and all pedicles appears normal. There is no spondylosis or listhesis. SI joints appears normal.
>
> Impression: Degenerative disc disease of L5. No fracture or dislocation.

Id.

On January 29, 2003, Bruton is seen by Dr. Breen.  (Doc. 158, Ex. A, Progress Notes). Bruton reported to Dr. Breen that has a history of surgery (a laminectomy) at age 26 for a herniated disc, and that he has had chronic back pain ever since.  Id.  Bruton relates his present pain to situps he had been doing two months earlier, and that treatment with Motrin has provided relief.  Id.  Dr. Breen's examination indicated pain upon palpation at the right sacroiliac joint, as to which he assessed sacroiliac joint strain.  Id.  Dr. Breen then prescribed a nine (9) day treatment of Prednisone and a two (2) week course of Naprosyn, 500 mg.  (Doc. 158, Ex. 2, Physician's Orders).

On February 5, 2003, Bruton was seen by Defendant, Dr. Breen.  (Doc. 158, Ex. A, Progress Notes).  Bruton reported that the pain had diminished, but that the Naprosyn was bothering his stomach.  Id.  Dr. Breen discontinued the Naprosyn and ordered a thirty (30) day course of Tylenol.  (Doc. 158, Ex. B, Physician's Orders).

Bruton was seen again by P.A. Miller on February 20, 2003, at which time he stated that the Tylenol was not helping and the pain was getting much worse. (Doc. 158, Ex. A, Progress Notes). Miller referred Bruton to Dr. Breen to be re-evaluated. Id.

Bruton was again seen by Dr. Breen on February 24, 2003, at which time Dr. Breen noted that the Plaintiff had taken both Naprosyn and Motrin, and that the Motrin helped the most with the pain. Id. His examination revealed only pain on palpation of the right sacroiliac joint. Id. Dr. Breen cancelled the order for Tylenol, and prescribed a two (2) week course of Motrin, 800 mg.   (Doc. 158, Ex. B, Physician's Orders).

On February 28, 2003, P.A. Miller again examined Bruton, and placed him on a thirty (30) day medical lay-in, and also ordered a cane for his use, and Ben Gay, a topical analgesic cream. (Doc. 158, Ex. A, Progress Notes, Ex. B, Physician's Orders).

On March 12, 2003, P.A. Miller met with Plaintiff, and prescribed him a further fourteen (14) day course of Motrin 800mg. Id.

On March 21, 2003, Bruton was seen by P.A. Davis, and the order for Motrin 800mg was renewed for a another fourteen (14) day period. Id.

On March 31, 2003, Bruton was again seen by P.A. Davis, at which time P.A. Davis placed Plaintiff on a five (5) day medical lay-in, and renewed the order for his cane for another six (6) months. Id.

On April 4, 2003, Plaintiff was again seen by P.A. Davis, at which time Davis noted that Bruton was walking with the use of his cane and was in no apparent distress. Fourteen-day renewals of Motrin 800 mg, and Ben Gay cream were ordered. Id.

7

On April 10, 2003, Plaintiff was seen by P.A. Davis, who noted that Bruton was having difficulty going to meals because he was walking slowly with a cane, and wrote for placement in the infirmary. Davis noted, however, that the infirmary was currently full, and that he would be placed in the infirmary on the next day.  Id.

On April 11, 2003, Plaintiff was seen by a nurse, who noted that Bruton reported having hip pain for 30-plus years from an old "muscle injury," and that when he sits or stands for a long time it "tears the scar tissue."   (Doc. 158, Ex. A, Progress Notes).  Bruton was issued a wheelchair at that time, and agreed to use it for 7 days, and then return for re-evaluation.  Id. Also on April 11, 2003, Nurse Hill noted that per Dr. Breen's orders that Bruton remain in the infirmary pending the availability of a handicapped cell, Bruton arrived at the infirmary in a wheelchair, and then walked to his cell.  Id.  Plaintiff was given his Motrin, Ben Gay and copy of the infirmary rules.  Id.  Also, Dr. Breen extended the use of the wheelchair for a one year period. (Doc. 158, Ex. B, Physician's Orders).  Bruton was then continually monitored by staff. (Doc. 158, Ex. A, Progress Reports).

On April 14, 2003, a handicapped cell became available.  Id.  Plaintiff was transferred to that cell in a wheelchair, where he was also issued a cane and his self-medications.  Id.

On April 15, 2003, Bruton was seen by P.A. Miller, at which time his Motrin 800mg was renewed for thirty (30) days, and Ben Gay cream was renewed for fourteen (14) days. (Doc. 158, Ex. A, Progress Notes, Ex. B, Physician's Orders).

Plaintiff was again seen by P.A. Miller on May 5, 2003, and Dr. Breen renewed his prescription for Motion 800mg for 21 days.  Id.

8

On May 9, 2003, Plaintiff was seen by P.A. Davis, and requested a renewal of his analgesic balm, which was renewed for a 30-day period. Id. Also at this time, Bruton complained of a bent right wheel on his wheelchair. Id.

On May 27, 2003, Plaintiff saw P.A. Miller again, and Dr. Breen renewed his order for Motrin 800mg for a 30-day period. Id.

On June 4, 2003, Plaintiff was seen by P.A. Miller, at which time he complained that his pain was "much worse," and that his current medications were not providing relief. Id.

Plaintiff was again seen on June 6, 2003 by P.A. Miller, and told him that Motrin was no longer working for him. Dr. Breen then wrote to change Bruton's pain medication from Motrin to Ultram 50mg. He ordered that the Motrin be discontinued when the Ultram, which had to be ordered, arrived. Id.

On June 9, 2003, Plaintiff was seen by Dr. Breen, at which time he complained of low back pain radiating down the back of his leg to his foot and ankle. Id. Dr. Breen noted that Bruton appeared in pain and walked with difficulty. Id. Dr. Breen prescribed a course of Prednisone for Bruton: 80mg four times a day, for 7 days, and then 40mg four times a day, for three weeks. (Doc. 158, Ex. B, Physician's Orders). Dr. Breen "counseled" the Plaintiff as to his prescription for a course of Prednisone for treatment of his pain, but Plaintiff refused, and left without signing a medication refusal form, stating "I'll straighten this out at sick call." (Doc. 158, Ex. A, Progress Notes). Dr. Breen noted at that time that he suspected Plaintiff had an HNP (herniated nucleus pulposa or herniated disc). Id.

9

Plaintiff admits that on June 9, 2003, at pill line, he was told by a nurse that Dr. Breen had prescribed Prednisone for his treatment, but that Plaintiff refused the medication, stating that he believed that Prednisone had previously almost given him a heart attack. (Doc. 39, Second Amended Complaint at ¶¶21-22).

On June 10, 2003, Plaintiff was again seen by P.A. Davis, who noted that Bruton refused the Prednisone, stating that "it makes my heart race." (Doc. 158, Ex. A, Progress Notes). Davis further counseled Bruton on the need for him to accept the Prednisone treatment, but Plaintiff refused. Id. Bruton admits that Davis explained this to him, telling him that Dr. Breen believed that Bruton had a herniated disc and that that was why he had prescribed the Prednisone. (Doc. 39, Second Amended complaint at ¶23). Plaintiff then signed a "Release from Responsibility" form, refusing to take the Prednisone. Doc. 158, Ex. F, Release From Responsibility for Medical Treatment). The form noted that the treatment he was refusing was for "possible HNP". Id.

On June 19, 2003, Plaintiff has alleged in his Amended Complaint, he discussed the matter of the Prednisone with Dr. Breen, at which time he told Dr. Breen that he believed that the dose of Prednisone that he had taken previously (in January, 2003) almost caused him to have a heart attack. (Doc. 39, Second Amended Complaint at ¶26). According to the Plaintiff, Dr. Breen told him at that time that Prednisone did not "affect the cardio-vascular function." Id. Plaintiff told Breen that he was concerned about the Prednisone because he had had a previous problem with an antibiotic he had once taken. Id. Dr. Breen again assured the Plaintiff that Prednisone did not affect the cardio-vascular function. Id.

On June 25, 2003, Plaintiff was again seen by P.A. Miller for medication renewal, and Dr. Breen renewed his order for Ultram 50mg for a 30-day period. (Doc. 158, Ex. A, Progress Notes and Ex. B, Physician's Orders).

On July 16, 2003, Bruton filed Grievance No. 57213 requesting to be allowed to be fed in his cell because being wheeled "across sidewalks as damaged, and as badly in need of repair as the walks in Coal Township," are causing him pain.  (Doc. 1, Ex. 10, Official Inmate Grievance).   Plaintiff also complained about the medical treatment he was receiving and requested to be seen by an outside physician.  Id.  Plaintiff stated that he had contacted Deputy Superintendent Piazza and Medical Administrator Wilma Sewell prior to submitting his grievance.  Id.

On July 29, 2003, the order for Ultram 50mg for Plaintiff was again renewed by Dr. Breen for 30 days.  (Doc. 158, Ex. B, Physician's Orders).

On August 5, 2003, Defendant Sewell, acting as the Grievance Officer, responded to Bruton's grievance with the following:

> The Medical Staff is correct, there is no such policy that allows one to be fed in his cell while on medical lay-in.  However, if you had been a patient in the infirmary, by all means, you would have been fed in your cell.
>
> You shared that this injury occurred in November, 20002, but you did not come to Sick Call until December 23, 2002.  You were placed on Medical lay-in for five days.
>
> On 12-30-02, an x-ray of the right hip was done and the findings are: AP and lateral examination of the lumbar spine shows no compression fractures.  There is narrowing of the disc space seen at L-5 as well as sclerotic changes of the adjacent vertebral.  The rest of the disc spaces, spinous process and all pedicles appear normal.  There is no spondylosis or listhesis.  S-I joints appear normal.

11

Impression: Degenerative disc disease of L-5.  No fracture or dislocation.  These results were shared with you on 12-31-02.

You continued to report to Sick Call for the month of January .  Chief complaint – pain in the hip.  On 1-29-03, you shared with Dr. Breen you had back surgery at the age of 26 and have had chronic back pain ever since.

You were seen again on 2-24-03.  Dr. Breen shared with you about your arthritis, which you have known about for yeas.  Dr. Breen prescribed Motrin for you for two weeks.  On 2-28-03, you received a medical lay-in for 30 days.

Mr. Burton (sic), I cannot attest tot he infirmary not having an available bed on 4-9-03.  However, I do see in your medical file that on 4-11-03, there were no handicap cells available.  At that time, you were placed in the infirmary.  A wheelchair was issued to you.  On 4-12-03, it was shared with you that you will remain housed in the infirmary until a handicap cell becomes available. On 4-14-03, you stated, "I don't want a handicapped cell."  Presently, you are in a handicapped cell with a wheelchair.

Did you report to Sick Call the days you could not sleep?

Mr. Burton, (sic), you have not complied with the suggestions from Dr. Breen.  Because Dr. Breen is our medical director, it is his decisions that we follow.  You will not be seen by an outside physician.

I cannot do anything about the damaged sidewalks.
You have access to health care and you are being treated appropriately.

(Doc. 1, Ex. 11, Initial Review Response).

Plaintiff filed a timely appeal to the Superintendent, who denied Plaintiff's appeal on

August 12, 2003, stating the following:

I have received your Request for Appeal from Initial Review of the above-noted grievance and I have reviewed the entire record related to this matter.

I find the response provided you by Ms. Sewell, in her capacity as Grievance Officer, to be proper and it shall, therefore, be sustained.  Your Request for Appeal from Initial Review of Grievance #57213 is denied.

12

(Doc. 1, Ex. 13, Appeal from Initial Review Grievance #57213).

On August 20, 2003, Bruton filed a final appeal to the Secretary's Officer of Inmate Grievances and Appeals.  (Doc. 1, Ex. 14, Appeal).

On August 28, 2003, Dr. Breen wrote for a 30-day renewal of Ultram 50mg for the Plaintiff for a 30-day period, as well as a 21-day course of AF cream.  (Doc. 158, Ex. B, Physician's Orders).

On September 12, 2003, Bruton wrote to Jeffrey A. Beard, the Secretary of the Department of Corrections, concerning the SCI-Coal Township Grievance System, SCI-Coal Township medical staff, Plaintiff's medical treatment, the condition of the side walks at SCI-Coal Township and his request to be treated by an outside physician.  (Doc. 1, Ex. 15, letter).

On September 29, 2003, Dr. Breen again renewed the 30-day order for Ultram 50mg for the Plaintiff.  (Doc. 158, Ex. B, Physician's Orders).

On October 4, 2003, Plaintiff was seen and evaluated by Dr. Stanish, who extended the order for Plaintiff's use of a cane, and reviewed the existing wheelchair order, which he noted Plaintiff was questioning.  Id.  Dr. Stanish ordered the cane for a further three months, and wrote that the cane and wheelchair should be re-evaluated.  Id.

On October 8, 2003, Dr. Breen re-evaluated Bruton for need of the wheelchair, and noted at that time that lower back pain was limited to lumbar range of motion (ROM).  Id.

On October 14, 2003, Bruton's appeal to Final Review of Grievance No. 57213 was denied by Sharon Burks, Chief Grievance Officer.  (Doc. 1, Ex. 16, Final Review decision).

13

On October 24, 2003, David Patton, Deputy Superintendent for Centralized Services responded to Plaintiff's September 12, 2003, correspondence to Secretary Beard with the following:

> Your correspondence to Secretary Beard dated September 12, 2003, has been referred to me for response.
>
> In my research, I found that most of the issues raised in your letter were addressed in a grievance response (57213) from Ms. Sewell, CHCA, in July 2003.
>
> Since that time you were again evaluated by Dr. Breen on October 8, 2003, for lower back pain. I am not aware of any incidents where inmates in wheelchairs have had accidents during my two months at this institution. I have, however, seen the sidewalks being repaired.
>
> You should continue to get on sick call as necessary for your medical problems and follow the medical instructions you receive.

(Doc. 1, Ex. 17, letter).

On October 27, 2003, Dr. Breen renewed the order for Ultram 50mg for Plaintiff, for an additional 30 days. (Doc. 158, Ex. B, Physician's Orders).

On November 26,2003, Dr. Breen again renewed the order for Ultram 50mg for the Plaintiff, for 30 days. Id.

On December 2, 2003, Plaintiff was examined by another physician, who noted that the Ultram was helping with Plaintiff's pain. Id. The current medications were continued. Id.

On December 15, 2003, Plaintiff was again seen by Dr. Breen, who noted that Bruton's back pain continued despite use of the Ultram, and that Plaintiff was in his wheelchair. Id.

Breen noted Plaintiff's history of HNP at L4-5 and ordered an MRI of Bruton's lumbosacral spine.  Id.

On December 29, 2003, Plaintiff was seen by P.A. Geragi, who noted that the MRI had been ordered, and that Plaintiff's medication was to be renewed.  Id.  Dr. Breen renewed the order for Ultram 50mg for seven days.  Id.

On January 5, 2004, P.A. Davis saw the Plaintiff for medication renewal, and noted suspected HNP at L4-L5. (Doc. 158, Ex. A, Progress Notes).  Dr. Breen renewed the order for Ultram 50mg for 14 days. (Doc. 158, Ex. B, Physician's Notes).

On January 20, 2004, P.A. Davis saw the Plaintiff for medication renewal, and Dr. Breen renewed Plaintiff's Ultram 50mg for 14 days. (Doc. 158, Exs. A and B).

Again on February 3, 2004, Plaintiff was seen by P.A. Geragi, and the Ultram 50mg was renewed by Dr. Breen for an additional 14 days.  Id.

On February 17, 2004, Plaintiff was again seen by P.A. Davis, and his Ultram 50mg prescription was renewed by Dr. Breen for 14 days.  Id.

On February 20, 2004, the MRI of Bruton's lumbar spine was conducted.  (Doc. 158, Ex. A, Progress Notes).

On March 2, 2004, Dr. Breen prescribed  an extension of Plaintiff's Ultram 50mg for 14 days.  (Doc. 158, Ex. B, Physician's Orders).

On March 12, 2004, the results of Bruton's MRI were received.  (Doc. 158, Ex. G, Radiology Report).  They revealed the following:

> Impression: L-sided herniation of L3-L4 disc. R-sided herniation of L5-S1 disc.
> Very small right paramedian protrusion of L2-L3 disc.

Id. After receiving the recent MRI results on Plaintiff's lumbar spine, Dr. Breen wrote a consultation request for Plaintiff to see Dr. Cabrera, a neurosurgeon, in which he noted:

> Inmate with 6 mo.-1 year history low back pain with radiculopathy.  At present
> is confined to a wheelchair because of chronic pain.  Aggressive treatment with
> routine modalities had failed. Please see MRI.

(Doc. 163, Ex. F, Consultation Record).

On April 1, 2004, Plaintiff was seen again by P.A. Davis, for medication renewal. Davis noted that Bruton had an MRI done, and that he was to be seen that day by Dr. Cabrera for a neurological consult. (Doc. 158, Ex. A, Progress Notes).  Dr. Breen renewed Plaintiff's order for Ultram 50mg for another 14 days. (Doc. 158, Ex. B, Physician's Orders).

On April 1, 2004, Plaintiff was examined in consultation by Jose I. Cabrera, M.D., who noted his history of low back pain with radiation to the right buttocks and leg area since November 2002. (Doc. 158, Ex. H, Cabrera report).   After examining the Plaintiff, and reviewing his records and the MRI, Dr. Cabrera opined that:

> [Bruton's] pain is secondary to a disc herniation at the L5-S1 level on the right
> side. I have several suggestions to make, one of which would be to consider an
> epidural injection of cortisone to see if that alleviates the pain. A second
> suggestion would be to try physical therapy and to consider a lumbar
> laminectomy at the L5-S1 level on the right side.

Id.

On April 5, 2004, almost immediately following receipt of the consultation report from Dr. Cabrera, Dr. Breen wrote a consultation request for Plaintiff to see Llewelyn Williams, M.D.,

16

at Shamokin Hospital, for pain management, and implementation of Dr. Cabrera's recommendation for an epidural injection.   (Doc. 163, Ex. F, Consultation Request).   An appointment was scheduled for May 17, 2004.   Id.

On April 30, 2004, Bruton saw P.A. Geragi again, at which time his Ultram was renewed.   (Doc. 158, Ex. A, Progress Notes).

On May 5, 2004, Bruton was seen again by Dr. Breen, at which time Dr. Breen counseled the Plaintiff as to the neurosurgical consultation with Dr. Cabrera, and about the upcoming referral to Dr. Williams.   Id.   Dr. Breen discussed the recommendations made by Dr. Cabrera and the plan for his visit with Dr. Williams.   Id.   Dr. Breen discussed the possible options with Bruton, and noted that Plaintiff "has reservations re: back surgery at this time, because his last surgery failed." Id.   Bruton also expressed his reluctance to proceed with the pain management option recommended by Dr. Cabrera: "He is also concerned about epidural and not sure he wants same. Encouraged to discuss with pain management [Dr. Williams]." Id.

On May 14, 2004, Plaintiff saw P.A. Davis again for renewal of his Ultram medication. Id.

On May 17, 2004, Plaintiff was transported to Shamokin Hospital, and was seen and evaluated by Dr. Williams, who noted the following medical history:

> The patient has had previous back surgery 20 years ago and claims that he did fine up until about a year and a half ago where he started to have some hip pain secondary to doing some sit-ups and has been utilizing a wheelchair for prolonged ambulation.

17

> Recently, while in a wheelchair, he said there was a jarring effect when he hit a hole, back in January. Since then he has been developing pain in this lower back radiating to the right leg. The patient claimed that it has improved significantly and now he is able to stay in bed when prior to that he wasn't able to stay in bed.

(Doc. 158, Ex. I, Consultation Report of Dr. Williams).

Following his examination of Bruton, Dr. Williams stated his diagnostic impression of Plaintiff as: "Scarring neuralgia. Post laminectomy syndrome. L5-S1 radiculopathy." Id.

Dr. Williams recommended the following plan:

> To do a lumbar epidural steroid injection, however, as I discussed with the patient he is hesitant to proceed with injection and wanted to do something less invasive and felt that he would like to try physical therapy before proceeding with an injection. I discussed with him the risks and complications of the injection and how the steroids work but he still felt that he would rather attempt the physical therapy before proceeding with disk modality. I will gladly see the patient in the future if he does intend on trying the injection. One of the things that we do in our pain clinic is encourage lifestyle changes.  He is on the Ultram and it seems to be working for him at this point. He is also a candidate for Neurontin 100 t.i.d. or 300 mg. t.i.d., but before putting him on more medications I would rather have tried an injection just in case it is possible to ameliorate the problem before putting him on more meds.

Id.  On May 20, 2004, based on the evaluation and recommendations from Dr. Williams, Dr. Breen noted the following:

> Will make arrangements for P.T. to see IM.  There is no P.T. @ Coal, however, I will make arrangements to have P.T. come here or send IM to where P.T. is located.

(Doc. 158, Ex. A, Progress Notes).

On May 26, 2004, Bruton was transferred from SCI-Coal Township to SCI-Dallas. (Doc. 158, Ex. A, Progress Notes).

IV.   **Discussion**

A.   **Medical Treatment**

To state a § 1983 claim, a plaintiff must plead two essential elements: (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000). Furthermore, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs . . . Personal involvement may be shown through allegations of personal direction or actual knowledge and acquiescence." Rode v. Dellarciprete, 845 F.2d 1195, 1207-08 (3d Cir. 1988). See also Sutton v. Rasheed, 323 F.3d 236, 249 (3d Cir. 2003) (citing Rode). Liability may not be imposed under § 1983 on the traditional standards of respondeat superior. Rode, 845 F.2d at 1207-08. Thus, "supervisory personnel are only liable for the § 1983 violations of their subordinates if they knew of, participated in or acquiesced in such conduct." Capone v. Marinelli, 868 F.2d 102, 106 n.7 (3d Cir. 1989) (citing Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1082 (3d Cir. 1976)). A doctor under contract to a state to provide medical services to prisoners is considered to be acting under color of state law, West v. Atkins, 487 U. S. 42, 54 (1988), and the principles just mentioned apply in that context as well. Hetzel v. Swartz, 909 F. Supp. 261, 264 (M.D. Pa. 1995).

The Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)(citing Estelle v. Gamble, 429 U.S. 97 (1976)). To establish a medical claim based on the Eighth

Amendment, an inmate must allege (1) acts or omissions by prison officials which are sufficiently harmful, and (2) evidence of deliberate indifference[1] to a serious medical need.[2] See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004); Natale v. Camden County Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003).   The inmate must satisfy this two-part, conjunctive test. Without the requisite mental state of deliberate indifference, a prison official's conduct alone will not constitute deliberate indifference.   See Farmer v. Brennan, 511 U.S. 825, 837-38 (1994).

    In the context of prison medical care, the Eighth Amendment can be violated by the deliberate indifference of: (1) prison doctors in their response to the prisoner's needs; (2) prison guards intentionally denying or delaying access to medical care; or (3) prison staff intentionally interfering with medical treatment once it is prescribed.   Estelle v. Gamble, 429 U.S. 97, 104 - 105 (1976).   However, if a prisoner is under the care of a medical expert, a non-medical prison official cannot be considered deliberately indifferent for failing to respond to an inmate's medical complaints "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner . . . ."   Spruill, 372 F.3d at 236; Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993) (prison personnel who are not

---

1.     To be deliberately indifferent, a prison official must know of, and disregard, an excessive risk to inmate health or safety.   Farmer, supra, 511 U.S. at 837-38 (1994).

2.     A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."   Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).

physicians cannot be considered deliberately indifferent for failing to respond to an inmate's medical needs when the inmate is already receiving treatment from the prison's medical staff).

A complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. . . ." Estelle v. Gamble, 429 U.S. 97, 106 (1976). Accordingly, a "medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice." Id., 429 U.S. at 107. "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990). But deliberate indifference may occur in instances where a doctor "insisted on continuing courses of treatment that the doctor knew were painful, ineffective or entailed substantial risk of serious harm." White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990). A doctor's disagreement with the professional judgment of another doctor is not actionable under the Eighth Amendment. See White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990). In sum, negligence, unsuccessful medical treatment, or medical malpractice do not give rise to a § 1983 cause of action, and an inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).

Plaintiff admits that he was seen and treated by medical personnel throughout his incarceration at SCI-Coal Township. In fact, a review of the record documentation reveals that Bruton was seen and treated extensively between December, 2003, and May, 2004. Bruton had x-ray studies on December 12, 2002 of his right hip, and on January 16, 2003 of his

lumbosacral spine; he had an MRI of his lumbar spine on February 20, 2004, and was seen and examined in consultation by a neurosurgeon, Dr. Cabrera on April 1, 2004, and in consultation with Dr. Williams concerning the implementation of recommendations made by Dr. Cabrera, on May 17, 2004.  Plaintiff's medical records show that he was prescribed medications for his medical needs and, when the prescribed medication did not improve Plaintiff's medical conditions, he was offered an alternative treatment plan of an epidural steroid injection, however, Plaintiff "wanted to do something less invasive".  Within days of learning of Plaintiff's treatment preference, arrangements were made for Plaintiff to receive physical therapy.  Thus, the record establishes meaningful efforts by the Defendants to provide Plaintiff with necessary medical care, and an attendant mental state that falls woefully short of deliberate indifference.

Bruton contends that Defendants were deliberately indifferent by not diagnosing his herniated disc sooner, and by not offering Plaintiff the medical treatment he believed he should have received, other than what was prescribed.  Plaintiff's belief, however, does not establish an Eighth Amendment violation.

The "deliberate indifference" standard for purposes of liability under section 1983 is a stringent standard of fault requiring proof that a defendant disregarded a known or obvious consequence of his action.  Board of County Commissioners of Bryan County v. Brown, 520 U.S. 397, 410  (1997). The defendant must be both aware of facts from which the inference could be drawn that a substantial harm exists and he must also draw the inference.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  An official is not deliberately indifferent if "he fails to

alleviate a significant risk that he should have identified." Id. Moreover, deliberate indifference to a serious medical need of a prisoner is distinguishable from a negligent diagnosis or treatment of a medical condition; only the former conduct violates the Eighth Amendment. Medical malpractice may give rise to a tort claim in state court but does not necessarily rise to the level of a federal constitutional violation. Kost v. Kozakiewicz, 1 F.3d 176, 185 (3d Cir.1993); Durmer v. O' Carroll, 991 F.2d 64, 67 (3d Cir.1993).

The Supreme Court explained the difference between negligence and constitutional claims in Estelle v. Gamble, 429 U.S. 97, 104 (1978).  In that case, the prisoner, Gamble, was injured when a bale of cotton fell on him while he was unloading a truck.  He went to the unit hospital where a medical assistant checked him for a hernia and sent him back to his cell.  He returned to the hospital where he was given pain pills by an inmate nurse and then was examined by a doctor.  The following day, his injury was diagnosed as a lower back strain; he was prescribed a pain reliever and a muscle relaxant.  Over the course of several weeks, Gamble was seen by several doctors who prescribed various pain relievers and provided him with medical work excuses.  Ultimately, despite his protests that his back hurt as much as it had the first day, medical staff certified Gamble to be capable of light work.  During the next two months, Gamble received a urinalysis, blood test, blood pressure measurement, and pain and blood pressure medication.  Subsequently, a medical assistant examined Gamble and ordered him hospitalized for treatment of irregular cardiac rhythm.

The Supreme Court held that Gamble's allegations failed to state a claim upon which relief could be granted against the defendant, both in his capacity as a treating physician and as the medical director of the Corrections Department.

> Gamble was seen by medical personnel on 17 occasions spanning a 3-month period....They treated his back injury, high blood pressure, and heart problems. Gamble has disclaimed any objection to the treatment provided for his high blood pressure and his heart problem; his complaint is "based solely on the lack of diagnosis and inadequate treatment of his back injury."  The doctors diagnosed his injury as a lower back strain and treated it with bed rest, muscle relaxants and pain relievers.  Respondent contends that more should have been done by way of diagnosis and treatment, and suggests a number of options that were not pursued.  The Court of Appeals agreed, stating: "Certainly an x-ray of (Gamble's) lower back might have been in order and other tests conducted that would have led to appropriate diagnosis and treatment for the daily pain and suffering he was experiencing."  But the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment.  A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.  At most it is medical malpractice, and as such the proper forum is the state court under the Texas Tort Claims Act.

Gamble, 427 U.S. at 107 (internal citations omitted) (emphasis added).

Like the prisoner in Gamble, Bruton has failed to demonstrate that he suffered a constitutional violation, a prerequisite for recovery under 42 U.S.C. § 1983.  Plaintiff's medical records indicate that he received substantial medical treatment for his complaints.  He received x-rays on two different occasions, and an MRI.  Based on the findings of the MRI, he was immediately referred to a neurosurgeon and then to an outside physician for a consultation concerning the recommendations made by the neurosurgeon.  While an intentional refusal to provide any medical treatment to an inmate suffering from a serious medical need manifests deliberate indifference and is actionable under the Eighth Amendment, the Eighth Amendment

24

does not require that a prisoner receive every medical treatment that he requests or that is available elsewhere.[3] A disagreement as to the appropriate choice of medical treatment does not give rise to a constitutional violation because the "right to be free from cruel and unusual punishment does not include the right to the treatment of one's choice." Layne v. Vinzant, 657 F.2d 468, 473 (1st Cir.1981). Mere disagreements over medical judgment do not state Eighth Amendment claims as there are typically several acceptable ways to treat an illness.  White v. Napoleon, 897 F.2d 103, 110 (3d Cir.1990) (citations omitted). Accord Young v. Quinlan, 960 F.2d 351, 358 n. 18 (3d Cir.1992) (an inmate's disagreement with prison personnel over the exercise of medical judgment does not state claim for relief under section 1983).

To survive Defendants' motions for summary judgment, Plaintiff is required to point to some evidence to show that Defendants knew or were aware of a substantial risk of serious harm to Plaintiff.  Singletary v. Pennsylvania Dept. of Corrections, 266 F.3d 186, 192 n. 2 (3d Cir.2001)).  Specifically, there is no record evidence that suggests that any Defendant knew that Plaintiff faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it or that they had any reason to know that he faced any

---

3.   See, e.g., Dias v. Vose, 960 F.2d 143 (1st Cir.1991); United States v. DeCologero, 821 F.2d 39, 42 (1st Cir.1987) ("though it is plain that an inmate deserves adequate medical care, he cannot insist that his institutional host provide him with the most sophisticated care money can buy"); Ferranti v. Moran, 618 F.2d 888, 891 (1st Cir.1980) (a dispute over the exercise of professional medical judgment may present a colorable claim of negligence, but it falls short of alleging a constitutional violation); Layne v. Vinzant, 657 F.2d 468, 474 (1st Cir.1981) (where the dispute is over the adequacy of the medical treatment, federal courts should be reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law).

substantial harm.  Nor does Plaintiff provide any expert evidence indicating that the course of treatment followed resulted in substantial harm.  Thus, the Plaintiff has failed to present evidence from which a reasonable jury could conclude that the Defendants possessed the culpable mental state necessary for Eighth Amendment liability to attach.  There is insufficient proof in the record for a fair-minded jury to conclude that the Defendants were deliberately indifferent to Plaintiff's medical needs.  See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d at 346; West v. Keve, 571 F.2d at 161.  Indeed, the extent and quality of medical attention that the Defendants provided Plaintiff precludes a finding of deliberate indifference.  Thus, Defendants are entitled to summary judgment as to Plaintiff's claims alleging inadequate medical treatment.  See Brandner v. First Correctional Medical, 167 Fed. Appx. 328, 2006 WL 358512 (3d Cir.2006) (holding that medical treatment consisting of MRI of knee yielding normal results did not evidence deliberate indifference); Banuelos v. McFarland, 41 F.3d 232 (5th Cir.1995) (a disagreement between an inmate and his physician concerning whether certain medical care was appropriate is actionable under section 1983 only under exceptional circumstances); Monmouth, 834 F.2d at 346 (deliberate indifference may be shown only where prison officials have actual knowledge of the need for treatment, yet intentionally refuse to provide any appropriate care).

**B.     Conditions of Sidewalks**

26

Plaintiff claims that the conditions of the sidewalks in May, 2003 amounted to cruel and unusual punishments in violation of the Eighth Amendment.  Plaintiff claims the conditions of the sidewalks caused him to re-injure his back when he was assisted over potholes in the sidewalk, by an inmate acting as a wheelchair pusher, who was in care, custody, or control of it. (Doc. 161, Ex. C, pp. 60-65).

In order for Bruton to prevail on his Eighth Amendment claim under 42 U.S.C. § 1983, Bruton must show that (1) he is incarcerated under conditions posing a substantial risk of serious harm, and (2) the prison officials involved had a sufficiently culpable state of mind, or knew of and disregarded an excessive risk to his health or safety.  See Farmer v. Brennan, 511 U.S. 825, 834 (1994); Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir.1997).  Mere negligent conduct that leads to serious injury of a prisoner by a prisoner does not expose a prison official to liability under § 1983.  Davidson v. Cannon, 474 U.S. 344, 347-48 (1986).  It is not enough to assert that a defendant should have recognized the risk; the evidence must be sufficient to support the inference that "the defendant must have recognized the excessive risk and ignored it."  Beers-Capitol v. Whetzel, 256 F.3d 120, 138 (3d Cir. 2001).  "Only those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation."  Hudson v. McMillian, 503 U.S. 1, 9 (1992) (citation omitted).

The first record evidence of Plaintiff's claimed injury as a result of being pushed in a wheelchair over potholes in the sidewalk is in a June 29, 2003, Inmate's Request to Staff Member Joseph Piazza, in which Bruton states th following:

27

> Dear Sir, on 06-09-03 I met with Dr. Breen.  I explained to Dr. Breen that during transport we had hit one of the deeper crevices in the sidewalk & I had a sharp shooting pain in my lower back as a result of the jolt.

(Doc. 1, Ex. 8, Inmate's Request to Staff Member).  Plaintiff's only request of Mr. Piazza is to allow him to be examined by an outside physician.  Id.

A review of Plaintiff's medical record for June 9, 2003, does not reveal any mention of Plaintiff complaining that he re-injured his back as a result of the conditions of the sidewalk. (Doc. 158, Ex. A, Progress Notes).  Nor does Plaintiff submit any expert evidence demonstrating that his herniated disc was either the result of being pushed in a wheelchair over damaged sidewalks, or was exasperated by such.

On August 7, 2003, Bruton filed an appeal of Grievance No. 57213 to Superintendent Gillis, in which he informed Defendant Gillis not only of the lack of medical treatment being afforded, but the condition of the sidewalks and their affect on his back, causing him additional pain.  (Doc. 1, Ex. 12, Appeal).

On September 12, 2003, Bruton wrote to Jeffrey A. Beard, the Secretary of the Department of Corrections, concerning the SCI-Coal Township Grievance System, SCI-Coal Township medical staff, Plaintiff's medical treatment, the condition of the side walks at SCI-Coal Township and his request to be treated by an outside physician.  (Doc. 1, Ex. 15, letter).

On October 24, 2003, David Patton, Deputy Superintendent for Centralized Services responded to Plaintiff's September 12, 2003, correspondence to Secretary Beard with the following, stating that he was "not aware of any incidents where inmates in wheelchairs have

28

had accidents during my two months at this institution", however he has "seen the sidewalks being repaired".  (Doc. 1, Ex. 17, letter).

In an October 28, 2003 response to David Patton, Bruton states that "the asphalt walk on the East side of the Institution is far more dangerous for wheelchair occupants than the West side sidewalks (recently repaired)" and that he was "pushed over the East side section of asphalt during the repairs to the West side walks".  (Doc. 1, Ex18, letter).  Thus, Plaintiff, himself, admits that the sidewalks were under repair.

Based on the above record evidence, the Court finds that to the extent that the sidewalks posed a substantial risk of harm, the prison officials were attempting to correct the problem.  As such, it cannot be concluded that the Defendants knew of and disregarded an excessive risk to Bruton's health or safety.  While the repairs may not have been as expeditiously as Bruton would have liked, such does not impute culpability.  Moreover, such an isolated incident, without any evidence of improper motive, does not rise to the level of a constitutional violation.  <u>White v. Napoleon</u>, 897 F. 2d 103, 109 (3d Cir. 1990).  Thus, Defendants are entitled to summary judgment.

An appropriate Order is attached.


Dated: September __30__, 2008.

/s/ A. Richard Caputo
_____
A. RICHARD CAPUTO
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DANIEL L. BRUTON,** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL NO. 3:CV-04-0083** |
| | : | |
| **v.** | : | **(Judge Caputo)** |
| | : | |
| **FRANK D. GILLIS, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## ORDER

**AND NOW, this 30th** day of September, 2008, in accordance with the foregoing memorandum, **IT IS HEREBY ORDERED THAT:**

1.  Defendants' motions for summary judgment (Docs. 157, 160, 163) are **GRANTED**. Judgment is hereby entered in favor of the Defendants and against the Plaintiff.

2.  The Clerk of Court is directed to **CLOSE** this case.

3.  Any appeal taken from this order will be deemed frivolous, without probable cause, and not taken in good faith.


                                        /s/ A. Richard Caputo
                                    _____
                                        A. RICHARD CAPUTO
                                        United States District Judge